KENNETH W. DONNELLY
District of Columbia Bar (No. 462996)
(LR IA 11-3 *pro hac vice* motion pending)
Email:  donnellyk@sec.gov
Telephone: (202) 551-4946
SAMANTHA M. WILLIAMS
Maryland Bar (No. 0012190024)
(LR IA 11-3 *pro hac vice* motion pending)
Email:  williamssam@sec.gov
Telephone: (202) 551-4061
MELISSA ARMSTRONG
Texas Bar (No. 24050234)
(LR IA 11-3 *pro hac vice* motion pending)
Email: armstrongme@sec.gov
Tel: (202) 551-4724

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549-5949

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

        vs.                                    2:21-cv-00632

SPOT TECH HOUSE, LTD., *formerly
known as*, SPOT OPTION, LTD.,               **COMPLAINT**

MALHAZ PINHAS
PATARKAZISHVILI, *also known as*
PINI PETER and PINHAS PETER,

and

RAN AMIRAN,

        Defendants,

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

1.      This case concerns a multi-million dollar fraudulent scheme involving unregistered offers and sales of security-based "binary options" to retail investors in the United States from at least April 2012 through August 2017 (the "Relevant Period").  The scheme was overseen by Malhaz Pinhas Patarkazishvili ("Pini Peter") and Ran Amiran ("Amiran") through a company they owned and controlled called Spot Option, Ltd. ("Spot Option") now known as Spot Option Tech House, Ltd. (collectively, the "Defendants").

2.      For the scheme to succeed, Spot Option needed to find investors who could be persuaded to trade the binary options that it issued through its proprietary online trading platform.  To do so, Spot Option contracted with third parties, which it referred to as "Partners," "White Labels," and "Brands" (hereinafter, "Partners"), to market its binary options.  Unbeknownst to investors, Spot Option structured its business model so that its Partners were the counterparty on every trade.  Under this structure, Spot Option and its Partners made their money principally from investor losses.

3.      To make the scheme profitable, Spot Option set the payout terms on its options in a way that made it likely that most investors would lose all or a substantial portion of their investment within the first five months of trading.  Spot Option trained its Partners, however, to deceptively market the binary options as profitable investments.  Spot Option used additional deceptive and manipulative practices to increase investors' losses and boost Spot Options' income stream.  These practices included manipulating the trading platform to increase the probability that trading would be unprofitable and offering investors a so-called "bonus" to lock-up investor funds and prevent withdrawals, which, when combined with the payout terms, virtually guaranteed investor losses.

4.      Through these and other deceptive and fraudulent acts, Spot Option sought and reached thousands of investors in the United States, including retirees,

who traded through its platform.  Many of those investors lost most of their money including, in some cases, hundreds of thousands of dollars meant for retirement.  Spot Option and its Partners, on the other hand, raked in millions in profits.

5.     As a result of its conduct, Defendant Spot Option violated the registration provisions of Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], the antifraud provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b–5].

6.     Defendants Pini Peter and Amiran are liable for violations of Section 5 of the Securities Act because they each played a substantial role in Spot Option's offers and sales of binary options.  Pini Peter and Amiran are also liable for Spot Option's violations of the Exchange Act because they are controlling persons of Spot Option as defined by the Exchange Act.  The SEC seeks disgorgement of Defendants' ill-gotten gains, prejudgment interest, civil monetary penalties, an injunction against further violations of the federal securities laws as to all Defendants, a specific conduct based injunction as to the individual defendants, and other appropriate relief.

**SUBJECT MATTER JURISDICTION AND VENUE**

7.     This Court has subject matter jurisdiction under Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

8.     Venue is proper in this district under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district, including offers of security-based binary options to at least one investor who in this district traded through Spot Option's platform via a Spot Option Partner and lost a

substantial amount of her retirement savings.  Venue also is proper here under 28 U.S.C. § 1391(c)(3) because all Defendants reside outside of the United States.

## DEFENDANTS

9.     Spot Option Tech House, Ltd., formerly known as, Spot Option, Ltd., is a private Israeli company headquartered or formerly headquartered in Israel. Currently, it does not appear to be engaged in any business activities.

10.     Malhaz Pinhas Patarkazishvili, also known as Pini Peter or Pinhas Peter, age 45, resides in Israel.  Pini Peter is the primary founder of Spot Option and, during the Relevant Period, was an Executive Chairman, Director, and/or Chief Executive Officer of Spot Option.  During the Relevant Period, Pini Peter was the chief architect of Spot Option's business model and business plans, had ultimate authority over Spot Option's financial accounts, and was in charge of Spot Option's entire management and business affairs.  During nearly all of this period, he owned over 90% of Spot Option's shares.  On March 13, 2017, Pini Peter transferred his ownership interest in Spot Option, about 94.22% of its then outstanding shares, to his wife, Limor Patarkazishvili.

11.     Ran Amiran, age 50, also resides in Israel.  During the Relevant Period, Amiran served first as Head of Business Development and then as Spot Option's President and Director.  Around March 2017, Amiran took over as Spot Option's Chief Executive Officer.  During the Relevant Period, Amiran owned approximately 2.5% of Spot Option's shares and, by the end of February 2015, was Spot Option's second largest shareholder.  Amiran was responsible for Spot Option's sales, marketing and business development, and he managed the day-to-day relationships with Spot Option's Partners.

## THE SCHEME

12.     A "binary option" is a financial instrument that expires at a predetermined time where the payout is contingent on the outcome of a yes/no proposition.  These options are "binary" because upon expiration they carry only two

4

possible outcomes.  If the holder's prediction is correct, he will receive a predetermined amount of money.   If it is incorrect, he will forfeit all or nearly all of his investment.  In one common form, the holder predicts whether a publicly-traded asset will be above or below a specific price at a specific time.  The underlying referenced asset in a binary option can be a security, currency, or commodity.

13.     Spot Option offered binary options based on all of these asset classes. Spot Option offered binary options based on the price of common stocks of many companies traded on United States exchanges, such as TEVA, Google, Coca-Cola, and Nike.  Spot Options also offered binary options based on various indices of securities, such as the NASDAQ Composite and the Dow Jones Industrial Average. These binary options are referred to hereinafter as "security-based" binary options.

14.     Binary options in which the underlying financial asset is a security or securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] (including any group or index of securities) are themselves "securities" within the meaning of those provisions.  The security-based binary options issued, offered, and sold by Spot Option were therefore securities.

15.     Under the Securities Act, any offer or sale of securities must be registered unless an exemption applies.  None of the security-based binary options offered by Spot Option were registered with the SEC, and no exemption applied.

16.     Spot Option determined and structured the key terms of the binary options offered and sold through its platform.  Specifically, Spot Option's platform provided investors with a choice of: (a) several forms of binary option; (b) numerous reference assets from multiple asset classes, including securities; (c) various expirations; (d) the investment amount; and (e) whether to predict the price of the reference asset would go up (*e.g.*, buy a "call" option) or go down (*e.g.*, buy a "put" option).  Spot Option also set the amounts investors would receive for winning trades

or would forfeit for losing trades (i.e., the profit/loss ratio), sometimes with the input of the Partners.

17.     Spot Option structured the profit/loss ratio so that on any one trade investors always risked losing more money on an incorrect prediction than they stood to gain on a correct prediction.  Spot Option typically set the ratio at a 70% to 85% profit for correct predictions and a 90% to 100% loss for incorrect predictions. Defendants knew that this payout structure made it extremely difficult if not impossible for investors to trade Spot Option's binary options profitably over time because, on average, investors only won half of their trades.

18.     Investors purchased binary options by accessing Spot Option's trading platform via a Partner website and choosing among the binary options offered. Generally, the investor then chose an underlying asset for the binary option, and the trading platform displayed that asset's historical prices and current price through a price ticker updated in real time.  The platform also displayed the percentage profit for correct predictions and the dollar amount of the return based on the amount of a specific investment.  The investor then chose an available expiration and predicted whether, on expiration, the asset would be above or below the price at the time of purchase.

19.     Typically, after the investor selected the parameters for the option, the investor executed the trade by clicking a button labelled "Apply," and/or "Approve." At this juncture, the investor was immediately and irrevocably committed to the purchase of the binary option.

20.     Spot Option provided its Partners with the image shown below as an example of what investors would see when accessing Spot Option's platform through the Partner website:

1
2
3
4
5
6
7
8
9



10
11
12
13

14    21.    In this example, at about 9:00 am on a 24-hour clock format, the investor

15 is looking at information on four binary options where the underlying assets are:

16 TADAWUL, the Saudi Arabian stock exchange, DUBAI, the Dubai stock exchange,

17 TEVA, a pharmaceutical company with stock trading on the New York Stock

18 Exchange, and the Tel Aviv stock exchange.  The investor has chosen to view

19 detailed information on the binary option based on the Dubai stock exchange.  The

20 detailed information includes a graph tracking the recent Dubai exchange level and

21 showing the level at 2099.73.  The investor has the option to predict whether the level

22 of the Dubai exchange will be above ("Put") or below ("Call") 2099.73 by 9:30 am.

23 If the investor chooses to invest the default amount, which is $25, and makes a

24 correct prediction, the investment will pay $44 (a $19 profit).  If the investor makes

25 an incorrect prediction, the investor will lose the $25.

26
27
28

**I.      Spot Option's Partners.**

22.      Spot Option developed and provided its Partners with a turnkey package of products, software, and services that included nearly all of the tools necessary to offer and sell Spot Option's security-based and other binary options online to anyone.

23.      Spot Option advertised to potential Partners that its package "generates great revenues with minimal efforts" and that it would enable Partners, under their own brand names, to operate an online business selling binary options in as little as four to six weeks.  Spot Option described what if offered as a "business in a package" that allowed Partners to succeed "without doing the work."  Spot Option similarly said that its package "generates great revenues with minimal efforts as most of the work is done by the Spot Option team."  Spot Option also touted to prospective Partners the profitability of the business by noting that the average investor lost 80% of their investment within five months.

24.      Spot Option offered this turnkey package to its Partners under so-called "White Label" agreements.  Under these agreements, Spot Option provided: (1) a customized, "user-friendly," website resembling the website of a legitimate broker and that allowed investors to access Spot Option's trading platform; (2) website content including charts, graphs, chat features, news and tutorials for retail investors; (3) content management system or "CMS" software that allowed the brokers to create and edit content on their websites; (4) hosting and management of the Partners' websites; (5) customer relationship management or "CRM" software; (6) third-party payment processing services linked to its trading platform that allowed investors to make deposits by credit card; (7) risk management services, which Spot Option provided twenty-four hours a day, seven days a week, and described as "the core of the business;" (8) training on all aspects of Spot Option's turnkey package, including how to market binary options to retail investors; (9) assistance with affiliate marketing which generated investor leads for the brokers; (10) iPhone and Android applications for Spot Option's trading platform; (11) miscellaneous back office

systems and ongoing support to resolve technical or other problems with any Spot Option product or service; and (12) a dedicated Spot Option account manager to ensure the brokers' businesses were "running smoothly."

25.     Investors accessed Spot Option's trading platform through the Partners' websites.  Many of the Partners' websites were hosted on Spot Option's server space, and all were connected through the internet to the servers hosting Spot Option's trading platform.

26.     Spot Option's Partners used various brand names, such as "Bloombex Options," "Lbinary," "Ivory Option," "SpotFN," and "Banc de Binary" and claimed in advertising materials that it offered and sold binary options through more than 300 Partners.

27.     Because it relied on Partners to drive traders to its platform, under the White Label agreements, Spot Option required its Partners to use their best efforts to "advertise, market, and promote" their websites and Spot Option's "trading platform as widely as possible."  The agreement also required the Partners to pay Spot Option an initial, fixed startup-fee and a monthly fee, which generally was calculated as a percentage of the total amount of monies that investors deposited in a month less the monies that Partners returned to investors in that same month.

**II.    Spot Option Trained its Partners to Recruit Investors, Including with False Statements; It Created False Advertising for its Partners.**

28.     Reliant on the Partners to bring investors to its platform, Spot Option trained its Partners on how to recruit and retain investors.

29.     Spot Option gave a "welcome package" to new Partners that included written training materials and sales scripts for the employees at the Partners' call centers.  It also offered its Partners and their employees, through the "Spot Option Academy," in-person and online training on how to recruit and retain investors.

30.     Spot Option's "welcome package" included a template for how to structure a "call center" to solicit investors by telephone and email.  The template

explained that a call center should include "conversion employees," whose job was to convince investors to deposit funds, and "retention employees," whose job was to increase the "value" of existing investors by persuading them to deposit as much as possible and by encouraging them to trade. Spot Option's template also included formulas for compensating call center employees and the terms of employee bonuses (including a commission structure based on investor deposits minus withdrawals).

31.  Spot Option trained Partners' on the "pros and cons" of various marketing techniques, including "affiliate marketing," "Pay-per-Click" advertising, "Google Adwords," web-banners, and search engine optimization.

32.  Spot Option supported its Partners' solicitation efforts by providing them with scripts that endorsed high pressure sales tactics and included false statements. Among other things, Spot Option's scripts instructed the Partners' call center employees to tell investors that most traders earned thousands of dollars a month trading binary options. For example, a Spot Option training script provided:

> Most <Brand Name> clients produce an income of 1000s of $ / month, just from trading in their spare time on our simple, efficient, and comprehensive platform.
>
> ****
>
> Most of our clients activate their trading account with a small deposit of 4-5,000$ to start learning how to trade and supplement, and in some cases replace, their income stream.

33.  The script also instructed Partner call center employees to convince investors that the Partner's employees and training material could teach the investor to make correct predictions:

> Using a range of simple tools provided by <Brand Name>, you can correctly predict market movements due to imminently occur, allowing you to gain returns of up to 85%, in as quickly as 60 seconds.
>
> ****
>
> [P]revious knowledge is not required - we provide all the tools and guidance to become a successful trader.
>
> ****

> After learning everything required for trading from our experts and educational
> materials, our clients started to comfortably trade and make a lot of money.
>
> ****
>
> [Y]ou can correctly predict market movements due to imminently occur,
> allowing you to gain returns of up to 85% in as quickly as 60 seconds[.]

34.   Spot Option's script also instructed Partner call center employees to tell
investors that any profits they had made were likely to continue.  For example:

> Sir, as you can see, you have made 50% return on your fund investment, within
> only 2 days.  This means you can make 150% a week, 600% a month! If you
> leverage your investment by 10 and increase your fund to be 5,000$, think of
> how much money you would have made by now?!
>
> ****
>
> I wouldn't recommend that you reduce your fund.  You have succeeded to earn
> XX% in X short period.  Doing so, will decrease your chances to continue
> making such an amazing income.

35.   The scripts even instructed Partners' call center employees to tell
investors that "[b]inary options are a great way to make faster money with lower
risk."

36.   Not only did Spot Option train its Partners to make false statements to
investors, it created misleading advertisements for them.  For example, Spot Option
created and disseminated video advertisements stating that "Binary options are the
fastest and most efficient way to convert your financial decisions into substantial
profits."

37.   All of the statements identified in paragraphs 32 through 36 were false
or misleading.  Trading Spot Option's security-based and other binary options was
not a way – efficient, fast, or otherwise – to earn substantial profits; nor was it low
risk.  The typical Spot Option investor did not earn thousands of dollars a month, was
not trained to make enough correct predictions, was not able to make a sufficient
amount of profitable trades to earn a return on his or her investment, and, ultimately,
lost most of his or her invested funds.

11

38.     All of the above misrepresentations were material.  A reasonable investor would consider the likely profitability of Spot Option's security-based and other binary options highly relevant in determining whether to trade them.

**III.    At Spot Option's Instruction, the Partners Induced Investors to Trade More or Refrain from Withdrawing Funds by Offering an Illusory Bonus.**

39.     Spot Option's platform permitted Partners to offer investors a "bonus" pitched as a benefit to investors.  In reality, the bonus's purpose was to induce investors to make large deposits and then prevent them from withdrawing that money.  Under the terms of the bonus, investors had to meet a "turnover requirement."  This meant that they could not withdraw any funds from their account—not even bonus funds—until they executed trades that totaled in value twenty-five times or more the value of the bonus.   Because on any one trade, an investor always risked losing more money on an incorrect prediction than he could gain on a correct prediction, the increased volume of trades caused by the turnover requirement virtually guaranteed that investors lost most or all of their money before they even met the turnover requirement.

40.     The scripts that Spot Option provided to the Partners for use by their call center employees included statements on how to dissuade investors who had lost money from withdrawing any remaining funds.  For example, one script instructed Partners to offer a bonus as a lure to encourage losing investors to make additional deposits.  That script instructed the call centers employees to pitch the bonus as a way to "recover part of the los[s]es."

41.     The statements that the bonus was beneficial or that it was a way for investors to recoup losses were false.  The bonus was really a way to induce investors to make larger deposits and then prevent investors from ever withdrawing their funds.

42.     These statements were material.  A reasonable investor would want to know the real reason the bonus was offered and that the bonus turnover requirements would likely cause the investor to incur greater losses.

1
2

**IV.     Spot Option Manipulated its Platform to Influence Investors' Decisions and to Make it Easier or More Difficult for Specific Traders to Profit.**

3       43.     One of the key services that Spot Option touted on its website and in its

4   advertising to Partners was a service called "Risk Management."  Spot Option

5   claimed to offer Partners "the most profit maximizing Risk Management available,"

6   and that its Risk Management Services "ensured" the Brand's "profitability."

7       44.     Because the Partners' profits and Spot Option's fee came entirely from

8   investor losses, Spot Option's Risk Management Services was advertised as a means

9   to "ensure" and "maximize" investor losses.

10       45.     Spot Option's Risk Management Services allowed Spot Option, on its

11   own initiative or as requested by the Partners, to designate investors as "low,"

12   "medium," or "high" risk.  The risk setting was displayed to the Partners through the

13   CRM software.  When investors made too much money, Partners requested Spot to

14   change the investor's profile to "high risk" to make it more probable the investor's

15   future trades would lose money.  As a Spot Option employee who worked in Risk

16   Management explained to a Partner, changing an investor's risk level to "high,"

17   "should be more aggressive and reducing his profits in the soon future."

18       46.     On November 17, 2014, for example, a Spot Option Risk Management

19   employee informed a Partner that Spot Option's system had placed a successful trader

20   on the highest risk setting.  "We are familiar with the client, he won some

21   consecutive EUR/USD positions on Friday morning and won them all.  Our system

22   already put him with highest risk level.  Let's hope he will keep trading."  Spot

23   Option's Risk Management employees even provided Partners with updates on the

24   losses incurred by investors whose risk level had been increased.  For example, on

25   April 22, 2014, an employee of Spot Option emailed an employee at one of its

26   Partners stating:  "He [the investor] lost 621$ in the last 6 days (16-22/4).

27   Eventually, we believe the changes will do the work."

28

47.     Similarly, the Partners could request that an investor be placed on a low risk setting in the hopes that making profitable trades would induce reluctant investors to trade or trade more, or add additional funds to their account.  For example, on July 10, 2014, an employee at a Partner asked his manager to "Please make sure he [investor] is on low risk.  I feel he is loaded."  On October 13, 2014, another employee wrote, "please put [investor] on low risk until i resive [sic] more money from him."  On the same day, another employee wrote "put [investor] on low risk need to put more money tnx."  On June 26, 2015, to induce a particular investor to deposit more funds, a Partner emailed Spot Option, "I need this client off high risk because we are getting too many losses and looks bad."

## V.     Spot Option Never Appropriately Disclosed That Its Partners Only Made Money When The Investors Lost Money.

48.     Because the Partners' compensation, and Spot Option's fee, were dependent on investor losses, Spot Option closely monitored the Partners' performance and, more specifically, the level of investor losses.

49.     Spot Option generated periodic "Risk" and other reports in which it evaluated the Spot Option Partners' performance, as a group and at times individually, on certain key aspects of their operations, which Spot Option referred to as "Key Performance Indicators" or "KPIs."  Generally, these reports showed for certain time periods, and among other things, how many new investors the Partners' had recruited, the amounts investors had deposited to and withdrawn from their trading accounts, the total dollar value of investor trading (which Spot Option referred to as "turnover"), and the total dollar value of investor losses.  Spot Option sent Risk reports that included this data to Pini Peter and Amiran.

50.     Spot Option developed benchmarks for certain of the KPIs that it had identified, and it instructed its Partners to constantly monitor their KPIs and to meet the prescribed benchmarks to improve their profitability.

51.     At times, Spot Option, through a dedicated Spot Option account manager, analyzed that Partner's performance on certain KPIs, and reviewed that analysis with the Partner.  In those reviews, Spot Option made suggestions for improvements, such as hiring an employee dedicated to mobile advertising or hiring a bulk email sender, and it instructed the Partners to meet the benchmarks that Spot Option had established.

52.     For example, one Spot Option account manager instructed a Partner that the ratio of first-time deposits to new deposits by existing investors "should be 30-70," and its turnover should be seven to ten times the value of investor deposits, because that way, "[p]eople lose their money very fast."

53.     Spot Option instructed another Partner that the average turnover "is 8-10," meaning the total dollars traded should be eight to ten times the total value of investor deposits.  Spot Option indicated that, in one month, the Partner's turnover was only approximately four times the value of total investor deposits and, as a result, this month was "very bad" and the Partner should "[m]ake your customers trader [sic] more."

54.     Spot Option also instructed its Partners not to allow investors to withdraw more than a small percentage of their deposits.

55.     The Partners, as a group, successfully achieved KPI benchmarks.  Spot Option reports show that, for the period December 2014 through June 2016, on a monthly basis, investors across all Spot Option Partners withdrew only 18% to 25% of the total dollars that they deposited.  These documents also show that the Partners' monthly net deposits (which represented investor losses and Partner revenue), correspondingly totaled approximately 75% to 82% of investors' total deposits. Other Spot Option reports show that for the period January 2014 through September 2017, on average, investors across all Spot Option Partners lost approximately 72% of their principal investments.

56.     Spot Option and its Partners, however, failed to appropriately disclose to investors that the Partners were the counterparty on trades or that the Partners made money exclusively from investor losses.

## VI.     Spot Option's Partners Used the Fraudulent Techniques Spot Option had Trained them on to Offer and Sell Binary Options to U.S. Residents.

57.     The Partners used the fraudulent techniques Spot Option had trained them on to offer and sell Spot Option's binary options to United States residents.

58.     For example, during the Relevant Period, a Partner using the brand names "BinaryBook" and "BigOption," structured its call centers to comport with Spot Option's call center template.  Employees working in these call centers, including Lee Elbaz, Lissa Mel, Shira Uzan, Yair Hadar, Liora Welles, and Austin Smith ("Partner Employees"), told prospective investors that trading Spot Option's binary options was profitable, offered investors the illusory bonus, and requested, directly or through a manger, that Spot Option change the risk setting for investors they had recruited.  As a result, they successfully recruited investors from the United States who traded Spot Option's binary options.

59.     In 2019, five of the six Partner Employees pled guilty to criminal conspiracy in connection with their work.  *See United States v. Mel*, 8:18-cr-00571-001 (TDC) (D. Md.); *United States v. Uzan*, 8:18-cr-00608-001 (TDC) (D. Md.); *United States v. Hadar*, 8:18-cr-00108-001 (TDC) (D. Md.); *United States v. Welles*, 8:18-cr-00613-001 (TDC) (D. Md.); and *United States v. Smith*, 8:18-cr-00087-001 (TDC) (D. Md.).

60.     Specifically, these employees admitted to making false statements to United States investors about the profitability of trading Spot Option's binary options and to offering United States investors the illusory bonus (described above).

61.     Following a trial, the remaining sixth Partner Employee was convicted of wire fraud and conspiracy to commit wire fraud, sentenced to 264 months of imprisonment, and ordered to pay $28 million in restitution to investors, which

16

obligation was shared jointly and severally with the other Partner Employees.  *United States v. Elbaz*, 8:18-cr-00157 (TDC) (D. Md.), Dkt. No. 394 (Aug. 7, 2020).

62.     During the Relevant Period, the investors recruited by the six Partner Employees on behalf of Spot Option lost over $28 million trading Spot Option's security-based and other binary options.

## VII.   Pini Peter and Amiran Exercised Authority and Control over Spot Option and Knew of Spot Option's Fraud and Unregistered Offers and Sales.

63.     Both Pini Peter and Amiran owned and had the power to control Spot Option's actions during the Relevant Period.

64.     Pini Peter was Spot Option's majority shareholder from at least August 2011 to March 2017, when Pini Peter transferred all of his shares to his wife.  Under Spot Option's Articles of Association, as CEO, Pini Peter was entitled to exercise all corporate powers not specifically reserved to others by law or by the Articles, including the power to appoint and dismiss all other corporate officers and directors, to direct the overall management of Spot Option, and to create and implement Spot Option's business strategy.

65.     Amiran was Spot Option's second-largest shareholder from at least February 2015 through the present.  From 2009 to 2016, Amiran served as the head of Business Development at Spot Option and, from 2016 onward, served as Spot Option's President and, from around March 2017, its CEO.  In these roles, Amiran had authority over Spot Option's global sales, marketing, business development, and day-to-day relationships with the Partners.

66.     Not only did both Pini Peter and Amiran have the power to control Spot Option's actions, Pini Peter approved all major decisions at Spot Option, both Pini Peter and Amiran directed Spot Option employees' work activities, and they each actively participated in Spot's core business.  Among other things:

(a)     Pini Peter attended trade shows to recruit new Partners, telling them to "stick with me" so that they would become "millionaires."

(b)     Pini Peter collaborated with Spot Option's Risk Management office, which among things suspended trading on certain assets or prohibited investors from using certain trading strategies in circumstances where investors were profiting from trades on those assets or strategies;

(c)     Pini Peter instructed a Spot Option employee to step in and serve as a Partner's marketing manager;

(d)     Pini Peter and Amiran spoke at training sessions for Spot Option's sales team;

(e)     Pini Peter and Amiran received periodic reports showing investor deposits, withdrawals, and losses for each Spot Option Partner with each Partner ranked from most to least profitable;

(f)     Subordinates provided or copied Pini Peter and Amiran on periodic reports and updates showing the status of Spot Option's efforts to create new Partner websites through which Partners could recruit new investors;

(g)     Subordinates notified Pini Peter of the date, identity, and amount of deposits made by specific investors;

(h)     Pini Peter and Amiran were often cited as the final authority on billing issues concerning the company's Partners;

(i)     Pini Peter and Amiran directed Spot Option employees to prepare software guides for the Partners; and

(j)     Amiran was closely involved in analyzing and specifying the terms of Spot Option's binary options and directed employees to adjust the terms for certain binary options.  For example, Amiran told Spot Option employees that an internal analysis showed that increasing the default investment amount for certain binary options from $5 to $10 increased trading volume in those options by 20%.  Based on that analysis, he instructed a Spot Option employee to raise the default investment amount to $10.

(k)     Subordinates provided or copied Pini Peter and Amiran on periodic reports showing the number of Partners that signed new contracts with Spot Option;

(l)     Subordinates provided Pini Peter and Amiran with status updates as to the implementation of a new Spot Option platform feature and sought input from them as to whether any Partners had encountered problems with the feature;

(m)    Pini Peter and Amiran negotiated key terms and executed, on behalf of Spot Option, the contracts between Spot Option and the Partners;

(n)    Pini Peter and Amiran served as points of contact for Partners when there were problems with Spot Option's platform that the Partners were unable to resolve with lower-level Spot Option employees;

(o)    Pini Peter and Amiran participated in meetings with the Partners;

(p)    Pini Peter directed the negotiations of a collection dispute with at least one Partner; and

(q)    Pini Peter participated in negotiations of contracts between Spot Option and vendors such as NASDAQ;

(r)    Pini Peter himself set the deadlines by which various Partners had to move the websites Spot Option had created for them off of Spot Option's servers.

67.    As owners, they were motivated to cause Spot Option to engage in fraud to maximize its profits.  As Spot Option's senior-most officers engaged in Spot Option's day-to-day business activities, they knew of Spot Option's core operations, which included: instructing Partners that they needed to retain at least 70% of all investor deposits; monitoring whether Partners were meeting this benchmark and assisting them in doing so; training Partners to recruit investors; training Partners to offer illusory bonuses; and changing investor risk settings.

68.     Pini Peter and Amiran knew, or at a minimum were reckless in not knowing, that most Spot Option investors lost between 70% and 80% of their funds, because they were copied on monthly KPI reports.  Pini Peter and Amiran also knew, or was reckless in not knowing, that Spot Option trained Partners to make the false and misleading statements set forth in Spot Option's sales scripts, including false statements that investors were likely to profit trading Spot Option's binary options. Indeed, Amiran was copied on an email to one Spot Option Partner that included the false and misleading sales scripts described above.

69.     During the Relevant Period, Spot made millions of dollars in connection with the offer and sale of security-based binary options.

## VIII.  Defendants' Contacts with the United States.

70.     Spot Option contracted with service providers in the United States to obtain software, server space, stock market data feeds, and other services needed to support its operations.  Those providers included NASDAQ, Amazon.com, Inc., Alphabet Inc. (Google Cloud), Imperva/Incapsula, Fresh Desk, and Go Daddy.  NASDAQ, among other things, provided data feeds showing the market price of securities and securities indices traded in the United States, which Spot Option used in the offer and sale of binary options.  Amazon, Google, and Imperva provided a variety of services to Spot Option's online sales operations and the functioning of its trading platform, including through servers at least some of which were located in the United States.  Pini Peter was the billing contact and payor on Spot Option's contract with Amazon to obtain server space and other services; he participated in the negotiations of Spot Option's initial contract with NASDAQ; and he registered the Spot Option domain name with Go Daddy and was the billing contact.

71.     Spot Option knew that several of its Partners sold Spot Option's binary options to United States residents because Spot Option controlled and/or accessed the

CRM for each Partner that tracked, among other things, each investor's name, telephone number, email address, nationality, and trading information.

72.     Throughout most of the Relevant Period, Spot Option serviced the Partner websites, including those of Partners soliciting U.S. investors.  Pini Peter and Amiran did not terminate Spot Option's contracts with these Partners after various United States law enforcement agencies filed actions against participants in the binary options industry.  Instead, they merely directed Partners who sold binary options to United States residents to transition the hosting for their websites to other, non-Spot Option servers.  Afterwards, Spot Option continued to allow United States investors recruited by its Partners to access its platform and trade binary options.

73.     At least three Spot Option Partners who solicited U.S. investors had physical operations in the United States.  One of those Partners operated the "CiTrades" and "VIP Citirader" brands, another operated the "OptionMint" brand, and a third operated the "SpotFN" brand.  Pini Peter and Amiran knew that Spot Option had contracted with these Partners because they personally approved new Partners and negotiated certain terms of Partner agreements.  Amiran, for example, negotiated the Partner fees with the owner of the CiTrades brand, and Pini Peter signed Spot Option's agreement with the owner of the SpotFN brand.

### FIRST CLAIM FOR RELIEF

**Unregistered Offer or Sale of Securities in
Violations of Section 5 of the Securities Act
(All Defendants)**

74.     Paragraphs 1 through 73 are realleged and incorporated by reference herein.

75.     Through Spot Option's trading platform and by means of Spot Option's Partners and the other methods and acts described above, the Defendants, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce, including the telephone and internet, to offer to sell or to sell to

residents of the United States binary options in which the underlying asset was a security or security-based index, including based on the price of common stock and the level of stock indices.  Defendants Pini Peter and Amiran each played a significant participating role and were therefore necessary participants and substantial factors in Spot Option's offers and sales.

76.     No registration statement was filed or was in effect with the SEC for any of the security-based binary options offered or sold by the Defendants.

77.     By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e].

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Spot Option)**

78.     Paragraphs 1 through 73 are realleged and incorporated by reference herein.

79.     Spot Option, by engaging in the conduct described above, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

80.     By reason of the foregoing, Spot Option violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act
### (Spot Option)

81.     Paragraphs 1 through 73 are realleged and incorporated by reference herein.

82.     Spot Option, by engaging in the conduct described above, in the offer or sale of securities, by the use of means of instrumentalities of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) knowingly or recklessly employed devices, scheme or artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of any untrue statements of material fact, or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

83.     By reason of the foregoing, Spot Option violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Control Person Liability under Section 20(a) of the Exchange Act for Spot Option's Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Pini Peter and Amiran)

84.     Paragraphs 1 through 73 and the Second Claim for Relief are realleged and incorporated by reference herein.

85.     During the Relevant Period, Defendants Pini Peter and Amiran each was a controlling person of Spot Option for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], directly or indirectly controlling the operations of Spot Option.

86.     Defendants Pini Peter and Amiran cannot establish that they did not directly or indirectly induce the acts of the Spot Option that constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, nor that they acted in good faith.

87.     Defendants Pini Peter and Amiran are therefore liable as controlling persons under Section 20(a) of the Exchange Act to the same extent as Spot Option would be liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that this Court:

(a)     Find that Defendants committed the alleged violations;

(b)     Order Defendants to disgorge, with prejudgment interest, all ill-gotten gains they received or derived from the activities set forth in this Complaint, and to repatriate any ill-gotten funds or assets they caused to be sent overseas;

(c)     Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3];

(d)     Permanently enjoin all Defendants from directly or indirectly violating Section 5 of the Securities Act [15 U.S.C. §§ 77e] and Sections 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(e)     Permanently enjoin Spot Option from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(f)     Grant specific conduct-based injunctions against Defendants Pini Peter and Amiran;

(g)     Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain

24

any suitable application or motion for additional relief within the jurisdiction of this Court; and

      (h)     Grant such other relief as may be necessary or appropriate.

Dated:  April 16, 2021               Respectfully submitted,


                                   */s/ Kenneth W. Donnelly*
                                   KENNETH W. DONNELLY
                                   SAMANTHA M. WILLIAMS
                                   MELISSA ARMSTRONG
                                   Attorneys for Plaintiff
                                   Securities and Exchange Commission